IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

| | | |
|---|---|---|
| MANISHA PATEL, M.D., | : | Case No. 1:24-cv-33 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| BON SECOURS MERCY HEALTH/ | : | |
| MERCY HEALTH PHYSICIANS | : | |
| CINCINNATI, LLC, | : | |
| | : | |
| Defendant. | : | |

## ORDER AND OPINION

This matter is before the Court on the Motion for Summary Judgment (Doc. 18) of

Defendants Bon Secours Mercy Health, Inc., and Mercy Health Physicians Cincinnati,

LLC, (collectively, "Mercy"). Plaintiff filed a Response in Opposition (Doc. 22), to which

Mercy filed a Reply in Support (Doc. 31). Thus, this matter is ripe for the Court's review.

For the following reasons, Mercy's Motion for Summary Judgment (Doc. 18) is

**GRANTED.**

## FACTS

### I. Plaintiff's Employment

Plaintiff Manisha Patel, M.D., is a female cardiovascular surgeon. (Plaintiff Dep.,

Doc. 16-1, Pg. ID 271.) Beginning in 2015, she worked as a cardiovascular surgeon for

Mercy. (*Id.* at Pg. ID 272.) Plaintiff primarily worked out of Mercy West Hospital, where

she served as the director for cardiovascular surgery. (*Id.*) Plaintiff estimates that she

performed between 80% and 90% of her surgeries at Mercy West Hospital. (*Id.*) In late 2021, Plaintiff was elected as chief of staff at Mercy West. (*Id.*)

## II. Issues with Mercy West's Cardiovascular Surgery Program

Prior to Plaintiff's promotion, in 2018, Mercy engaged Corazon, Inc. to assist Mercy in developing a strategic plan for its cardiovascular program; Corazon combined the data from its study into a Summary Report ("2018 Report"). (Plaintiff Dep., Doc. 16-1, Pg. ID 277; *see also* 2018 Corazon Report, Doc. 16-1, Ex. A, Pg. ID 331.) According to the 2018 Report, part of Corazon's inquiry was to consider consolidation of Mercy's cardiovascular program. (*Id.*; *see also* 2018 Corazon Report, Doc. 16-1, Ex. A, Pg. ID 334.) While the 2018 Report did not recommend immediate consolidation, it noted that consolidation may become necessary if other operational issues were not addressed. (2018 Corazon Report, Doc. 16-1, Ex. A, Pg. ID 338-39.)

In 2022, Corazon conducted another study for Mercy, the Open Heart Surgery Assessment, combining that data into another Summary Report ("2022 Report"). (2022 Corazon Report, Doc. 16-1, Ex. G, Pg. ID 395.) The 2022 Report noted that Mercy West and Jewish Hospital, another Mercy hospital, had significantly lower numbers of open-heart surgeries compared to the other Mercy hospitals. (*Id.* at Pg. ID 400.) Additionally, the 2022 Report found that, in 2021, Plaintiff performed the least number of open-heart surgeries among the other Mercy surgeons; the next lowest had two more surgeries, and the highest had double the number of surgeries. (*Id.*) Plaintiff met the Ohio standard for number of surgeries a year, twenty-five, but only one of Mercy's hospitals met the Ohio standard for number of total cases per year, 150. (*Id.* at Pg. ID 399.) As a note, Plaintiff

2

states that, based on the records she herself maintained, she actually performed 142 total surgeries in 2021. (Plaintiff Decl., Doc. 22-2, ¶ 19.) Nevertheless, citing both the deficient caseload number, along with other issues, such as surgical outcomes and referrals to surgeons outside of the hospital network, Mercy decided to close the cardiovascular surgery programs at both Mercy West and Jewish Hospital. (Mercy Program Development Report, Doc. 16-1, Ex. J, Pg. ID 408; Seitz Dep., Doc. 27-1, Pg. ID 737.)

### III.    Issues with Plaintiff's Performance

On September 27, 2022, Plaintiff met with Dr. Mark Townsend and Brad Bertke, where they informed Plaintiff of Mercy's consolidation plan for the cardiovascular surgery program. (Plaintiff Dep., Doc. 16-1, Pg. ID 283.) In the meeting, Plaintiff testified that they mentioned that cardiologists were referring patients outside of the hospital for cardiovascular surgeries, which was one of the parameters used in evaluating which programs would close. (*Id.*) At the end of the meeting, Plaintiff asked if there was a future for her in the cardiac surgery program at Mercy, to which Bertke replied that they hoped Plaintiff would "pivot" to thoracic surgery. (*Id.* at Pg. ID 283-84.) Later that day, Townsend and Bertke drafted an email summarizing the meeting they had with Plaintiff. (*Id.* at Pg. ID 283.) While Plaintiff admits that Townsend and Bertke mentioned surgical volumes, cardiologist confidence referrals, and patient outcomes as reasons for the closure of the two programs, as the email suggests, she states that they did not specifically convey those factors as reasons for her separation from the program. (*Id.* at Pg. ID 284.)

Bertke met again with Plaintiff on September 30, 2022, along with Dr. Steve Feagins, to discuss Plaintiff's future at Mercy West. (Plaintiff Dep., Doc. 16-1, Pg. ID 291.)

She also met separately with Brenda VanDeVenter on October 12, 2022 (*Id.*) In that meeting, VanDeVenter informed Plaintiff that Mercy closed Mercy West's cardiovascular surgery program because of "declining volumes and the year-to-date financial loss." (VanDeVenter Email, Doc. 16-1, Ex. I, Pg. ID 402.) Then, on October 27, 2022, Plaintiff met with Courtney Seitz, Chief Operating Officer of Mercy, and Dr. Yasir Khan, Chief Medical Officer of Mercy, to discuss future employment. (Plaintiff Dep., Doc. 16-1, Pg. ID 292.) In that meeting, Seitz informed Plaintiff that Mercy would no longer employ her as a cardiovascular surgeon, citing Plaintiff's low volumes, outcomes, and lack of confidence by cardiologists. (*Id.*) In the same meeting, though, they discussed Plaintiff remaining at Mercy as a thoracic surgeon. (*Id.*) Seitz followed up this discussion with an email formally offering Plaintiff the position of thoracic surgeon. (Seitz Email, Doc. 16-1, Ex. P, Pg. ID 425.) Plaintiff then drafted a letter to Seitz regarding her termination, expressing that she felt unfairly treated when cardiovascular surgeons at other hospitals, including younger less-experienced surgeons, kept their positions. (November Complaint, Doc. 16-1, Ex. N, Pg. ID 421.) Plaintiff eventually responded to the job offer in a letter dated November 21, 2022, stating that she had not received clarification for questions she had about the offer and rejecting the offer. (Rejection Letter, Doc. 16-1, Ex. Q, Pg. ID 428.) Plaintiff also indicated that she would have been open to the role had the role allowed her to maintain a cardiothoracic presence. (Plaintiff Dep., Doc. 16-1, Pg. ID 299.) The same day, Plaintiff wrote a letter to the Ethics Committee at Mercy, complaining of discrimination surrounding her termination. (Ethics Committee Letter, Doc. 16-1, Ex. R, Pg. ID 430-35.)

4

Plaintiff subsequently applied for open cardiovascular surgeon positions at Mercy in February 2023. At that time, Plaintiff still worked at Mercy and she was represented by counsel. (Plaintiff Dep., Doc. 16-1, Pg. ID 302.) Mercy's counsel informed Plaintiff's counsel, though, that "given the decision to separate due to poor outcomes and lack of cardiologist confidence, there would not be a desire to reemploy" Plaintiff within cardiac surgery. (*Id.*)

## PROCEDURAL POSTURE

On January 23, 2024, Plaintiff filed her Complaint against Mercy, bringing claims of: (1) discrimination on the basis of race, sex, color, national origin, and religion, in violation of Title VII and Ohio Revised Code § 4112; (2) age discrimination in violation of the Age Discrimination Employment Act ("ADEA") and Ohio Revised Code § 4112; (3) retaliation in violation of Title VII and Ohio Revised Code § 4112; and (4) retaliation in violation of Ohio public policy. (Compl., Doc. 1.) After discovery, on January 30, 2026, Mercy filed a Motion for Summary Judgment, seeking summary judgment on all of Plaintiff's claims. (Motion, Doc. 18). This Motion has been fully briefed. (*See* Response, Doc. 22; Reply, Doc. 31.) Plaintiff filed an Objection to Appendix A of the Declaration of Courtney Seitz, which Mercy used in support of its Motion for Summary Judgment. (Objection, Docs. 32, 33.) This Objection has also been fully briefed. (*See* Response, Doc. 34; Reply, Doc. 35.) Thus, these matters are ripe for the Court's review.

## LAW

When there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law, the district court shall grant summary judgment.

5

Fed. R. Civ. P. 56(a). The moving party has the burden to conclusively show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If the moving party meets that burden, then it becomes the nonmoving party's responsibility to point to specific facts showing a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A court is under no obligation to search the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996).

Moreover, a "mere scintilla" of evidence in support of the nonmoving party's position is not enough to avoid summary judgment. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005). Rather, to preclude summary judgment, the nonmoving party must put forth probative evidence on which a jury could reasonably reach a verdict in that party's favor. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy*, 39 F.3d at 1347. If the nonmoving party fails to make the necessary showing for an element on which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## ANALYSIS

As a preliminary matter, the Court will address Plaintiff's Objection to Appendix A of the Seitz Declaration (Docs. 32, 33). The Court then proceeds to the merits of Mercy's Motion for Summary Judgment (Doc. 18).

### I. Mercy's Objection to Appendix A of the Seitz Declaration

Federal Rule of Civil Procedure 56(c)(2) states that, at the summary judgment stage, a party may object that material cited to support or dispute a fact would not be admissible as evidence. Plaintiff argues that the Court should not consider Exhibit A,

6

attached to the declaration of Courtney Seitz, which consists of three undated letters, in reviewing Mercy's Motion for Summary Judgment. (Objection, Doc. 33, Pg. ID 1097.) The letters were written by three different Mercy cardiologists and outline several issues they had with Plaintiff's professional behavior and surgical outcomes; they all mention that they referred patients around Plaintiff as a result of these issues. (Letters, Ex. A, Doc. 17-1.) These letters, according to Plaintiff, are not admissible because "there is no testimony in the record from any witness showing that the three letters contained in Exhibit A existed or were considered for purposes of the September 2022 decision to terminate Plaintiff." (Objection, Doc. 33, Pg. ID 1097.) Plaintiff reiterates that "the decisions at issue must be based on the particularized facts before [Mercy] at the time the decisions were made." (*Id.* at Pg. ID 1099 (citing Motion, Doc. 18, Pg. ID 459; *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006)).) And, to that end, Plaintiff points out that Mercy "did not dispute that the letters from the three cardiologists were not considered during the decision-making process or that they even existed as of September of 2022." (*Id.*) Accordingly, Plaintiff states that these letters would not be admissible at trial to form Mercy's justification for Plaintiff's termination. (*Id.*) Put differently, the letters were not part of the particularized facts before Mercy at the time of Plaintiff's termination, making them irrelevant and thus inadmissible. (*Id.* at Pg. ID 1095-96.)

In response, Mercy does not contend that Dr. Townsend or the leadership team had these three letters at the time of Plaintiff's termination. (Response, Doc. 34, Pg. ID 1102.) However, Mercy argues that this fact does not render the letters irrelevant or inadmissible. (*Id.*) Rather, the letters "establish the veracity of one of the primary reasons

7

for Plaintiff's separation—i.e. cardiologists' were referring cases around Plaintiff due to lack of confidence in her skills." (*Id.*) Essentially, these letters corroborate the legitimate, nondiscriminatory reason behind Mercy's decision to terminate Plaintiff, even though Dr. Townsend and the leadership team did not rely specifically on the statements in these letters. (*Id.* at Pg. ID 1104.) Mercy speculates that Plaintiff's Objection "must be aimed at attempting to establish pretext" as to Mercy's reason for termination; to this end, Mercy contends that the letters "put to rest any suggestion that Mercy concocted this fact." (*Id.*) According to Mercy, these statements show that "there is no factual dispute that cardiologists were referring cases around Plaintiff." (*Id.*)

In her Reply, Plaintiff agrees that Mercy is "certainly permitted to argue that there was a concern about cardiologist confidence." (Reply, Doc. 35, Pg. ID 1108.) But, "because the three undated letters at issue were not considered at the time of the decision, they cannot be used as evidence to justify the decision to separate Plaintiff," and also should not be "viewed as 'confirming' that there was an issue regarding cardiologist confidence." (*Id.*) Nor can Mercy use Plaintiff's testimony that she concluded that, in some cases, cardiologists were referring around her. (*Id.* at Pg. ID 1109.)

The Court agrees with Plaintiff. To the extent that Mercy seeks to use these letters to corroborate its purported reason for Plaintiff's termination, "such evidence is irrelevant for the analysis required to decide this motion." *Skinner v. Michigan Rod Prods., Inc.*, No. 18-12708, 2021 WL 3772892, at *8 (E.D. Mich. Aug. 25, 2021). Mercy's "honest belief [regarding why it terminated Plaintiff] must be based on 'particularized facts that were before it *at the time the decision was made.*'" *Id.* (quoting *Seeger v., Cincinnati Bell Tel.*

*Co., LLC,* 681 F.3d 274, 285 (6th Cir. 2012)). As Plaintiff points out, and Mercy concedes, there is no evidence that these letters were before Seitz or the leadership team at the time of their decision to terminate Plaintiff. Thus, the Court finds Plaintiff's Objection well-taken and will not consider these letters in reviewing Mercy's Motion for Summary Judgment, including Plaintiff's testimony regarding her review of these letters. (*See* Plaintiff's Dep., Doc. 16-1, Pg. ID 285-86.)

## II. Merits of Mercy's Motion for Summary Judgment

### a. Employment Discrimination Claims

Having addressed that preliminary matter, the Court now moves on to the merits of Mercy's Motion for Summary Judgment. Courts analyze Title VII claims and Ohio Civil Rights Act claims under the same standard. *Nelson v. Ball Corp.,* 656 F. App'x 131, 133 (6th Cir. 2016); *see also Newman v. Fed. Exp. Corp.,* 266 F.3d 401, 406 (6th Cir. 2001). In such cases, when a plaintiff has not presented any direct evidence of discrimination, as here, the *McDonnell Douglas* burden-shifting framework applies. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *see also Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248 (1981). Under this framework, a plaintiff faces the initial burden of presenting a prima facie case, which creates a rebuttable presumption of discrimination that requires the defendant "to 'articulate some legitimate, nondiscriminatory reason' for taking the challenged action." *Johnson v. Kroger Co.,* 319 F.3d 858, 866 (6th Cir. 2003) (quoting *Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 572-73 (6th Cir. 2000)). Once the defendant satisfies this burden, the plaintiff must prove that the defendant's proffered reason was a "pretext to hide unlawful discrimination." *Id.* (quoting *Johnson,* 215 F.3d at 573). To reiterate,

9

Plaintiff brings claims of discrimination based on her gender, race, age, color, national origin, and religion under both Ohio and federal law. (Compl., Doc. 1.) The Court will examine each set of claims in turn. Mercy argues, and Plaintiff does not dispute, that Plaintiff has not presented direct evidence of discrimination; thus, Plaintiff must make her case using indirect evidence under the *McDonnell-Douglas* burden-shifting framework. (Motion, Doc. 18, Pg. ID 450; Response, Doc. 22, Pg. ID 488.)

To begin, the Court examines whether Plaintiff has established a prima facie case of discrimination. *Johnson,* 319 F.3d at 866. While Plaintiff brings her claims under several theories of discrimination, all of them require generally the same elements. To establish a prima facie case of discrimination, Plaintiff must demonstrate: (1) she is a member of a protected class; (2) she was qualified for the position and performed it satisfactorily; (3) she suffered an adverse employment action; and (4) she was treated differently than similarly situated, non-protected employees, or was replaced by a person outside the protected class. *Laster v. City of Kalamazoo,* 746 F.3d 714, 727 (6th Cir. 2014). To restate the fourth element, Plaintiff must show that her race was the "but for" cause of the adverse action. *Bostock v. Clayton Cnty., Georgia,* 590 U.S. 644, 656 (2020). Mercy states that Plaintiff's discrimination claims fail as a matter of law on the fourth element. (Motion, Doc. 18, Pg. ID 449.) Alternatively, if Plaintiff presents a prima facie case, shifting the burden to Mercy, then Mercy argues that it had a legitimate, non-discriminatory reason for firing Plaintiff and is still entitled to summary judgment. (*Id.* at Pg. ID 453-59.)

Beginning with an analysis of the prima facie case, Mercy points out that, since it discontinued the cardiovascular surgery program at Mercy West, no one replaced

10

Plaintiff. (Motion, Doc. 18, Pg. ID 450.) So, Plaintiff needs to establish the fourth element by showing that a similarly situated comparator was treated more favorably. (*Id.*) Importantly, she "must show that employees she uses as comparators are similarly-situated in all respects." (*Id.* at Pg. ID 451 (citing *Stotts v. Memphis Fire Dept.*, 858 F.2d 289 (6th Cir. 1988)) (cleaned up).) More specifically, the comparators must "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (cleaned up). And, when performance is compared between two employees, Plaintiff must show that she and her comparator were "involved in acts against the employer of comparable seriousness," but that the comparator "received less stringent discipline." *Stotts*, 858 F.2d at 298.

For purposes of her case, Plaintiff names Dr. Russell Vester as her comparator. (Motion, Doc. 18, Pg. ID 452 (quoting Plaintiff Dep., Doc. 16-1, Pg. ID 293, 300).) When Mercy closed the cardiovascular surgery program at Jewish Hospital, where Dr. Vester worked, Mercy offered him a position in cardiovascular surgery at Fairfield. (Plaintiff's Dep., Doc. 16-1, Pg. ID 293; *see also* Seitz Dep., Doc. 27-1, Pg. ID 729-30.) Meanwhile, Mercy closed the program at Mercy West and offered Plaintiff a position as a thoracic surgeon. (Plaintiff Dep., Doc. 16-1, Pg. ID 283-84.) But, Mercy maintains that Plaintiff and Dr. Vester were not "similarly situated" for purposes of her prima facie case. (Motion, Doc. 18, Pg. ID 452.) Specifically, Mercy points out that Plaintiff was the lowest performing cardiovascular surgeon in terms of volumes, while Dr. Vester was the

highest. (*Id.* (citing Plaintiff Dep., Doc. 16-1, Pg. ID 289; Ex. G, Pg. ID 400).) And, Mercy emphasizes that Plaintiff "is unaware of any cardiologists referring patients around Dr. Vester due to lack of confidence in his [cardiovascular] surgery skills." (*Id.*) Furthermore, in regard to Plaintiff's age discrimination claims, Mercy notes that Dr. Vester is older than Plaintiff. (*Id.* at Pg. ID 453.) Thus, Mercy contends that Plaintiff has failed to identify a similarly situated comparator for each of her discrimination claims. (*Id.*)

Additionally, Mercy argues that Plaintiff's claims fail for another reason—"a similarly situated younger male [cardiovascular] surgeon was treated less favorably than her." (Motion, Doc. 18, Pg. ID 453.) Specifically, Dr. Topalidis, a cardiovascular surgeon at Mercy Fairfield, had his position eliminated when Mercy West and Jewish Hospital closed. (*Id.* (citing Seitz Decl., Doc. 17, Pg. ID 346).) However, unlike Plaintiff, Dr. Topalidis did not receive an offer to work in a different position with Mercy. (*Id.* (citing Seitz Decl., Doc. 17, Pg. ID 346).) As Mercy states, Plaintiff "is unable to establish the fourth prong of her prima facie case where the non-protected employee receives a more severe punishment." (*Id.* (citing *Sanders v. City of Toledo*, No. 3:19-CV-1785, 2022 WL 4537068, at *12 (N.D. Ohio Sept. 28, 2022).)

In her Response, Plaintiff first points out that courts should "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." (Response, Doc. 22, Pg. ID 489 (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 351 (6th Cir. 1988)).) To that end, Plaintiff notes all the similarities between her and Dr. Vester: (1) they were the primary cardiovascular surgeons and directors of the programs at their respective hospitals; (2)

12

their hospitals only had one cardiovascular surgeon; (3) they both worked at Mercy for about twenty years; (4) their programs were slated for closure, so their positions would be eliminated; (5) their programs had similar volumes and outcomes; and (6) the closures of their programs were due to volume of cases, outcomes, and lack of confidence by referring cardiologists. (*Id.* at Pg. ID 490.) Essentially, Plaintiff argues that they were in exactly the same position and needed a new primary location; yet, Mercy offered Dr. Vester an opportunity to remain a cardiovascular surgeon at Fairfield, an "undiminished role," while Mercy offered Plaintiff a "demotion" as thoracic surgeon. (*Id.*) Plaintiff also states that this is not a misconduct or discipline case where she alleges that a non-protected employee received less discipline. (*Id.* at Pg. ID 491.) And, Plaintiff notes that there were two positions available at Fairfield for cardiovascular surgery, so this is not a failure-to-hire case involving a head-to-head comparison of their relative qualifications. (*Id.*)

In response to Mercy's argument that Dr. Vester had higher volumes and did not have other doctors refer around him, Plaintiff states that this is not so. (Response, Doc. 22, Pg. ID 492.) Rather, she argues that their 2021 volumes were similar, according to her own records, and that their volumes were similar in 2019 and 2022, according to Mercy's records. (*Id.*) She also states that cardiologists' lack of confidence in her does not affect Dr. Vester's status as a comparator because no one ever discussed this issue with her prior to the September 27, 2022, meeting. (*Id.*) Rather, because Dr. Vester and Plaintiff were both directors of the equivalent programs at their respective hospitals, and those programs were closed for the same reasons, Dr. Vester is similarly situated for purposes

13

of her prima facie case. (*Id.* at Pg. ID 493.) And, Plaintiff takes issue with the comparison to Dr. Topalidis, since his position was not eliminated because of restructuring, like Plaintiff's; instead, Plaintiff asserts that he was terminated due to performance. (*Id.*)

In its Reply, Mercy first points out that Plaintiff failed to directly rebut Mercy's argument that her prima facie age discrimination claims fail because Dr. Vester, her comparator, is older than she is. (Reply, Doc. 31, Pg. ID 1068, n.1.) To this end, the Court agrees that Plaintiff has failed to make a prima facie case of age discrimination. Plaintiff failed to point to a similarly situated, *non*-protected employee treated more favorably than she. *See Ercegovich*, 154 F.3d at 350. Accordingly, Mercy is entitled to summary judgment on her age discrimination claims.

Moving on, Mercy reiterates that Dr. Vester was treated more favorably — offered a position as a cardiovascular surgeon at Fairfield — because he was "an objectively better performing surgeon." (Reply, Doc. 31, Pg. ID 1067.) Thus, he was "not similarly situated to Plaintiff in the most *critical* aspects of a surgeon's employment." (*Id.*) While Plaintiff states that cardiologists' confidence and surgical volumes are not relevant factors for her comparison with Dr. Vester, Mercy points out that Plaintiff admitted that both of these factors are critical. (*Id.* at Pg. ID 1068 (citing Plaintiff Dep., Doc. 16-1, Pg. ID 277, 286-87).) Additionally, Mercy notes that Plaintiff failed to address that her surgical outcomes were not on par with those of Dr. Vester. (*Id.* (citing Plaintiff Dep., Doc. 16-1, Pg. ID 293; Reece Dep., Doc. 29-1, Pg. ID 1015; VanDeVenter Dep., Doc. 26-1, Pg. ID 621).) And, Plaintiff acknowledged that these are all important, interrelated factors to evaluate an individual surgeon's performance. (*Id.* (citing Plaintiff Dep., Doc. 16-1, Pg. ID 278, 294).)

14

Furthermore, Mercy argues that Plaintiff "has no true rebuttal" regarding the distinction between her performance and Dr. Vester's with respect to cardiologists' confidence in them as surgeons. (*Id.* at Pg. ID 1069.) As Mercy states, "[w]hen Plaintiff became aware of this distinguishing factor between her and Dr. Vester is not relevant," when there is "no factual dispute that cardiologists were referring cases around the Plaintiff, and not Dr. Vester." (*Id.*)

Regarding surgical volumes, Mercy indicates that Plaintiff misstates the data in her Response. (Reply, Doc. 31, Pg. ID 1069.) Plaintiff claims, without evidence, that she and Dr. Vester had comparable surgical volumes in 2021, but the report shows she had fewer than half the number of surgeries. (*Id.* (citing 2022 Corazon Report, Doc. 16-1, Ex. G, Pg. ID 400).) And, while Plaintiff states that Mercy limited the comparison to 2021 only, Mercy notes that the Corazon Report evaluated surgical volumes over the period of 2019 through 2022 and still found Mercy West to have the lowest number of cardiovascular surgeries. (*Id.* at Pg. ID 1069-70 (citing 2022 Corazon Report, Doc. 16-1, Ex. G, Pg. ID 400).) Moreover, even considering Plaintiff's own declaration of her volumes, these numbers were still lower than Dr. Vester's. (*Id.* (citing Plaintiff Decl., Doc. 22-2, Pg. ID 357).)

In evaluating whether Plaintiff and Dr. Vester are similarly situated, the Court recognizes that Plaintiff "need not demonstrate an exact correlation," but must show that she and Dr. Vester are "similar in all of the relevant aspects." *Blewett v. Howard-Whitsett*, No. 25-2586, 2026 WL 166410, at *3 (6th Cir. Jan. 21, 2026) (quoting *Ercegovich*, 154 F.3d at 352) (cleaned up). And, the Sixth Circuit has consistently found disparities in job performance to be a relevant factor in determining whether two employees are "similarly

15

situated in all relevant aspects." *See id.* at *3; *see also Jones v. Ann Arbor Pub. Sch.*, No. 21-1327, 2022 WL 4836421, at *3 (6th Cir. June 22, 2022) (plaintiff failed to put forth evidence that her proposed comparator had similar performance issues as her and thus could not establish fourth prong of discrimination claim). This Court, too, has found the same. *See, e.g., Turner v. McCullough-Hyde Mem'l Hosp.*, No. 1:17-CV-339, 2020 WL 5798392, at *7 (S.D. Ohio Sept. 29, 2020) (McFarland, J.) ("relative job performance is a relevant aspect" of the fourth prong).

To this end, the data shows that Dr. Vester had higher surgical volumes and better outcomes than Plaintiff. (*See* 2022 Corazon Report, Doc. 16-1, Ex. G; Reece Dep., Doc. 29-1, Pg. ID 1015; VanDeVenter Dep., Doc. 26-1, Pg. ID 621.) Plaintiff's only rebuttal to this data is her own declaration claiming that her personal records show that her numbers were "comparable" to Dr. Vester's. (*See* Plaintiff Decl., Doc. 22-2, Pg. ID 357.) And, as Mercy points out, even accepting these numbers as true, her self-reported numbers still show Dr. Vester's volumes as higher than hers. (*Id.; see* Reply, Doc. 31, Pg. ID 1070.) Critically, the record contains many references to the fact that cardiologists referred patients around Plaintiff, revealing their lack of confidence in her surgical performance. (Seitz Dep., Doc. 27-1, Pg. ID 741; VanDeVenter Dep., Doc. 26-1, Pg. ID 649; Townsend Dep., Doc. 28-1, Pg. ID 872, 883.) Plaintiff can point to no similar issues with Dr. Vester's performance. Accordingly, the Court finds that Dr. Vester is not similarly situated to Plaintiff. He had none of the well-documented performance issues Plaintiff had, and indeed was one of the top-performing surgeons in terms of volume and outcomes. (*See* 2022 Corazon Report, Doc. 16-1, Ex. G, Pg. ID 400; VanDeVenter Dep., Doc. 26-1, Pg. ID

16

621.) Thus, Plaintiff has failed to establish a prima facie case for her remaining discrimination claims. *See Jones*, 2022 WL 7836421, at *3. Mercy is entitled to summary judgment on these claims.

### b. Statutory Retaliation Claims

Mercy next argues that Plaintiff's retaliation claims under federal and Ohio law also fail. (Motion, Doc. 18, Pg. ID 459.) To establish a prima facie case for retaliation under either Title VII or Ohio Revised Code § 4112, Plaintiff must prove that: (1) she engaged in a protected activity under Title VII; (2) Mercy knew she exercised her protected rights; (3) Mercy subsequently took an adverse employment action against her; and (4) Plaintiff's protected activity was the direct cause of the adverse employment action. *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020) (citing *Laster v. City of Kalamazoo*, 746 F.3d 714, 730-31 (6th Cir. 2014)). If Plaintiff successfully establishes her prima facie case, then the *McDonnell Douglas* framework shifts the burden to Mercy to show a "legitimate, nondiscriminatory reason for its action." *McDonnell Douglas Corp.*, 411 U.S. at 802. And, if Mercy satisfies that burden, then Plaintiff must demonstrate that Mercy's proffered reason is pretext for discrimination. *Id.* at 804.

Mercy contends that Plaintiff's protected activity, the November 2022 letters she sent to Seitz and the Ethics Committee, occurred *after* the adverse action, Mercy's communication of its decision not to retain her as a cardiovascular surgeon in September and October 2022. (Motion, Doc. 18, Pg. ID 460.) While Plaintiff nevertheless applied for an open position as a cardiovascular surgeon in February 2023, Mercy argues that their rejection of her application was not a separate adverse action, as it was premised on the

17

same reason they terminated her in the first place. (*Id.*) Accordingly, Mercy contends, she cannot prove the third element of her retaliation claims. (*Id.*)

Plaintiff argues that Mercy failed to address Plaintiff's letters, even though her employment lasted until March 30, 2023. (Response, Doc. 22, Pg. ID 507.) Additionally, at that time, there were two open cardiovascular surgeon positions, but Mercy refused to review and reconsider the matter after they had decided to terminate her. (*Id.*) Mercy responds that Mercy did not ignore the Seitz email; instead, Seitz sent it to Dr. Townsend and Mercy's legal department for review. (*Id.* (citing Seitz Dep., Doc. 27-1, Pg. ID 774).) Mercy "evaluated internally" and determined that the reason behind Plaintiff's separation was the performance issues, like low surgery volumes and low confidence, which were not seen with the other surgeons. (*Id.*)

In examining the four prongs of a prima facie retaliation case, the Court must first pinpoint the adverse action. Mercy decided to terminate Plaintiff as a cardiovascular surgeon in September 2022 and informed her of that decision around the same time, offering instead that she stay as a thoracic surgeon. (*See* Plaintiff Dep., Doc. 16-1, Pg. ID 283, 292.) They cited specific reasons for their decision that Plaintiff would not remain a cardiovascular surgeon: low surgery numbers, negative outcomes, and cardiologist confidence. (*Id.*) In November 2022, Plaintiff engaged in protected activity when she complained both to Seitz and the Ethics Committee of employment discrimination. (*See* Seitz Letter, Doc. 16-1, Ex. N; Ethics Committee Letter, Doc. 16-1, Ex. R.) Plaintiff then applied for a position at Mercy as a cardiovascular surgeon anyway; she was later told that Mercy would not consider her for that position because of the reasons they had

18

mentioned earlier. (Plaintiff Dep., Doc. 16-1, Pg. ID 302.) Essentially, the viability of Plaintiff's prima facie retaliation case centers on whether Mercy's subsequent decision not to consider Plaintiff's application is a separate adverse action from its initial decision to terminate her. If it is, then Plaintiff's protected activity occurred prior to the adverse action, satisfying the third element; if it is not separate, though, then the adverse action came before Plaintiff engaged in protected activity, and her prima facie case falls.

The Court finds, though, that the termination and subsequent failure to hire Plaintiff are the same adverse action. In coming to this conclusion, the Court notes that Plaintiff knew that Mercy was ending Mercy West's cardiovascular surgery program, where she worked. (Plaintiff Dep., Doc. 16-1, Pg. ID 284.) She then learned, at a later meeting, that Mercy was not selecting her to continue cardiovascular surgery at the programs in their other hospitals. (*Id.* at Pg. ID 292.) Plaintiff applied for those surgeon positions anyway, despite the fact that Mercy had already told her she would not fill those roles. (*Id.* at Pg. ID 302.) Thus, Mercy's non-consideration of her application is not a separate and distinct decision from its initial decision that she would not fill the remaining roles; it is a reiteration of the adverse action taken in October 2022. In other words, Mercy had already considered — and rejected — Plaintiff for the cardiovascular surgeon roles when deciding how to restructure personnel for the remaining programs in the fall of 2022; it simply maintained its decision not to place her in its other cardiovascular surgery programs. *See Southmayd v. Apria Healthcare, Inc.*, 412 F. Supp. 2d 848, 862-63 (E.D. Tenn. Jan. 31, 2006) (employer began considering applicants to fill plaintiff's spot and denied plaintiff's application for rehire months after plaintiff's

19

termination and the filing of her EEOC charge). Plaintiff's protected activity occurred subsequent to the adverse action, not prior. Her prima facie case fails on the third element.

### c. Ohio Public Policy Retaliation Claim

Finally, Mercy finds issue with Plaintiff's retaliation claim in violation of Ohio public policy. (Motion, Doc. 18, Pg. ID 461.) Specifically, Mercy points out that the cognizable claim under Ohio law is a claim for wrongful termination in violation of Ohio public policy. (*Id.*) The four elements for this claim are: (1) that a clear public policy existed and was manifested either in a state or federal constitution, statute, or administrative regulation or in the common law; (2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy; (3) that the plaintiff's dismissal was motivated by the conduct related to the public policy; and (4) that the employer lacked an overriding legitimate business justification for the dismissal. *Miracle v. Ohio Dept. of Veterans Affairs*, 137 N.E.3d 1110, 1113 (Ohio 2019).

To this end, Plaintiff claims that she was not retained or rehired because she opposed Mercy's plan to continue to perform procedures prohibited by law. (Compl., Doc. 1, ¶ 41.) And, she objected to the plan that she cover cardiac emergencies when she had been removed as a cardiovascular surgeon. (*Id.* at ¶ 42.) Accordingly, she argues that the decision not to rehire her was motivated by her opposition to this conduct. (*Id.* at ¶ 44; *see also* Response, Doc. 22, Pg. ID 509.) Notably, though, Plaintiff made these complaints *after* she was terminated. (*See* Plaintiff Dep., Doc. 16-1, Pg. ID 300; *see also* Letter to Ethics Committee, Doc. 16-1, Ex. N.) Accordingly, as Mercy correctly points out,

20

she cannot show that she was terminated because of her opposition to Mercy's plan. (*See* Motion, Doc. 18, Pg. ID 461.) Thus, the only claim she can make is that Mercy refused to rehire her because she opposed its actions that violate public policy. However, Mercy is correct that Plaintiff provides no cases suggesting that this cause of action exists in Ohio. *See Peck v. Elyria Foundry*, 347 F. App'x 139, 148 (6th Cir. 2009) ("[There is] no case suggesting that Ohio would extend the tort [of public policy wrongful termination] to a failure to hire case."); *see also Bools v. General Elec. Co.* 70 F. Supp. 2d 829, 831-32 (S.D. Ohio 1999) ("[O]ur review of Ohio law finds no case extending the public policy tort to claims involving a wrongful failure to hire or retaliation."); *Fontaine v. Clermont Cnty. Bd. of Comm'rs*, 633 F. Supp. 2d 530, 540 (S.D. Ohio 2007) (finding the same). Summary judgment on this claim is thus proper.

## CONCLUSION

Based on the foregoing reasons, the Court **ORDERS** the following:

1. Plaintiff's Objection to Appendix A of the Seitz Declaration (Docs. 32, 33) is **SUSTAINED**;

2. Mercy's Motion for Summary Judgment (Doc. 18) is **GRANTED**;

3. Summary judgment is **ENTERED** in favor of Mercy on all of Plaintiff's claims; and

4. This case is **TERMINATED** from the Court's docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____

JUDGE MATTHEW W. McFARLAND

22